WILFREDO ANTONIO ROMERO      )
CARRANZA,                    )
                             )
            Petitioner,      )
                             )        1:17CV80
      v.                     )        1:13CR230-2
                             )
UNITED STATES OF AMERICA,    )
                             )
            Respondent.      )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

  Petitioner Wilfredo Antonio Romero-Carranza, a federal
prisoner, filed a motion, and a supporting memorandum, seeking
to vacate, set aside, or correct his sentence pursuant to 28
U.S.C. § 2255 ("2255 Pet.") in case number 1:13CR230-2.[1] (Docs.
216, 217.) The Government filed a response, (Doc. 221), and
Petitioner filed a reply, (Doc. 226). The matter is now before
the court for a ruling. See Rule 8, Rules Governing § 2255
Proceedings.

---

[1] Unless otherwise noted, citations are to this criminal
proceeding, Case No. 1:13CR230-2, and citations to Petitioner's
Section 2255 Motion are to the CM/ECF footer number.
Additionally, the undersigned has endeavored to respond to all
of the many variations of Petitioner's claims. To the extent
that any have not been specifically discussed, they should still
be denied for essentially the reasons set out herein.

# I. BACKGROUND

On May 30, 2013, a grand jury indicted Petitioner and co-defendant Samer Fakhri Othman, charging them in Count One with conspiracy to own, operate, maintain, and control a chop shop, in violation of 18 U.S.C. § 2322(a)(1) and 18 U.S.C. § 371; as well as charging Petitioner in Count Two with knowingly conducting operations in a chop shop, in violation of 18 U.S.C. §§ 2322(a)(1) and 2; and in Count Three with transporting in interstate commerce a stolen motor vehicle, in violation of 18 U.S.C. §§ 2312 and 2. (Doc. 1.) Attorney Bryan Emery Gates, Jr. ("Gates" or "trial counsel") was appointed to represent Petitioner. (Doc. 14.)

On October 1, 2013, the grand jury returned a Superseding Indictment against Petitioner charging Petitioner in Count One with conspiracy to own, operate, maintain, and control a chop shop, in violation of 18 U.S.C. § 2322(a)(1) and 18 U.S.C. § 371; in Count Two with knowingly conducting operations in a chop shop, in violation of 18 U.S.C. §§ 2322(a)(1) and 2; in Count Three with transporting in interstate commerce a stolen motor vehicle, in violation of 18 U.S.C. §§ 2312 and 2; in Count Four with possessing, concealing, and storing a stolen motor vehicle that had crossed a state boundary, in violation of 18 U.S.C. §§ 2313 and 2; and in Count Five with illegal re-entry by

- 2 -

an alien removed for a felony conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). (Doc. 26.)

On October 29, 2013, the grand jury returned a Superseding Indictment charging Petitioner and co-defendants Edwin Enrique Ortiz Rodriguez ("Ortiz"), Steve Anthony Turner ("Turner"), James Antonio Wilkerson ("Wilkerson"), Jesus Gonzalez-Perez ("Perez"), and Maria Del Larios Carmen ("Larios") in Count One with conspiracy to own, operate, maintain, and control a chop shop, in violation of 18 U.S.C. § 2322(a)(1) and 18 U.S.C. § 371; charging Petitioner, Ortiz, Turner, Wilkerson, Perez, and Larios in Count Two with knowingly conducting operations in a chop shop, in violation of 18 U.S.C. §§ 2322(a)(1) and 2; charging Petitioner, Ortiz, and Turner in Counts Three, Four, Five, and Six with transporting in interstate commerce stolen motor vehicles, in violation of 18 U.S.C. §§ 2312 and 2; and charging Petitioner in Count Seven with possessing, concealing, and storing a stolen motor vehicle that had crossed a state boundary, in violation of 18 U.S.C. §§ 2313 and 2.[2]

---

[2] On that same date, the grand jury returned a separate, single-count indictment charging Petitioner with illegal re-entry by an alien removed for a felony conviction in violation of 8 U.S.C. §§ 1326(a) and (b)(1). See United States v. Carranza, No. 1:13CR419-1 (M.D.N.C. Oct. 29, 2013) ("Re-Entry Case"). A jury convicted Petitioner on that count on December 19, 2013. See id.

- 3 -

On February 24, 2014, Petitioner proceeded to trial upon his plea of not guilty. Following closing arguments on March 4, 2014, the court granted in part Petitioner's oral motion under Rule 29 of the Federal Rules of Criminal Procedure and dismissed Count Four. (See Minute Entry 03/04/2014; see also Trial Tr. vol. 7 (Doc. 172) at 20, 24-29.) Thereafter, on March 6, 2014, the jury found Petitioner guilty on all remaining counts. (See Minute Entry 03/06/2014; Jury Verdict (Doc. 101).) The court sentenced Petitioner in both the instant case and his Re-Entry Case on July 23, 2014, imposing a total term of 84 months imprisonment - 60 months imprisonment on Count One, and 84 months imprisonment on Counts Two, Three, Five, Six, and Seven, and 84 months imprisonment on the sole count in the Re-Entry Case, all of which to run concurrently. (See Judgment (Doc. 143) at 2.) Petitioner appealed, (Doc. 144), and the United States Court of Appeals for the Fourth Circuit appointed Charles Robinson Brewer ("Brewer" or "appellate counsel") to represent Petitioner on appeal, (Doc. 146). On April 22, 2016, the Fourth Circuit affirmed Petitioner's judgment, and mandate was issued

- 4 -

on June 6, 2016. See United States v. Carranza, 645 F. App'x 297 (4th Cir. 2016).[3]

## II.   **PETITIONER'S GROUNDS FOR RELIEF**

Petitioner raises five grounds for relief in his Section 2255 Motion. (2255 Pet. (Doc. 216).) In Ground One, Petitioner alleges 29 instances of ineffective assistance by his trial counsel (what Petitioner terms "attorney's fraud") at virtually every phase of his trial, from pretrial motions to sentencing. (See id. at 2-42; see also Pet'r's Reply (Doc. 226) at 2-3.) Ground Two contends that the trial court was "biased" and "abuse[d its] discretion" in regard to its handling of various motions, witnesses, jury instructions, and sentencing matters. (See 2255 Pet. (Doc. 216) at 42-51; Doc. 216-1 at 1-15; see also Pet'r's Reply Doc. 226) at 4.) Via Ground Three, Petitioner alleges eleven instances of "malicious and vindictive prosecution." (See Doc. 216-1 at 15-19; see also Pet'r's Reply (Doc. 226) at 5.) Ground Four alleges the ineffective assistance of Petitioner's appellate counsel, (see Doc. 216-1 at 19; see also Pet'r's Reply (Doc. 226) at 6), and in Ground Five, Petitioner asserts that the practice of not providing criminal

---

[3]   The Fourth Circuit also affirmed Petitioner's judgment in the Re-Entry Case.  See United States v. Carranza, 640 F. App'x 248 (4th Cir. 2016).

- 5 -

defendants with physical copies of discovery material violates due process rights, (see Doc. 216-1 at 20-21; see also Pet'r's Reply (Doc. 226) at 6-8).[4] The Government, in turn, denies each of these claims. (See Doc. 221.)

## III. DISCUSSION

### A.   Ground One — Ineffective Assistance at Trial

To prove ineffective assistance of counsel generally, a petitioner must establish: (1) that his attorney's performance fell below a reasonable standard for defense attorneys, and (2) that he was prejudiced by this performance. See Strickland v. Washington, 466 U.S. 668, 688 (1984). With respect to the first prong, a petitioner bears the burden of affirmatively showing that his counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms. Id. at 688-89; Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). With respect to the second prong, a petitioner must show that prejudice resulted from the deficient performance, that is, "that there is a

---

[4] On February 7, 2017, a United States Magistrate Judge ordered Ground Six of Petitioner's Section 2255 Motion stricken, as that Ground "raise[d] constitutional claims based on Petitioner's treatment at Rivers Correctional Institution, a private prison where he [wa]s housed" and "[s]uch claims are not an appropriate part of a § 2255 action." (Doc. 217 at 1.)

- 6 -

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Spencer, 18 F.3d at 233 (citing Strickland, 466 U.S. at 694). To obtain a hearing or any form of relief, "a habeas petitioner must come forward with some evidence that the claim might have merit." See Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrogated on other grounds recognized by Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999).

### 1. Subcontention 1 – Motion to Suppress Evidence from April 3, 2012 Fairfax Traffic Stop

Petitioner first faults his trial counsel for failing to move to suppress evidence obtained during a traffic stop and subsequent search of a vehicle in which Petitioner was a passenger conducted on April 3, 2012, by Detectives David Kroll and Brendon Hooke with the Fairfax (Virginia) Police Department. (2255 Pet. (Doc. 216) at 2-4.) In support of that contention, Petitioner maintains that Detective Kroll "stopped said vehicle under the excuse that the driver had made an improper lane change which even that is not true," falsely stated that the "smell of marihuana was coming out from the vehicle," and then "even violated the fabricated probable cause, because [the

- 7 -

officers] were suppose [sic] just to look for marihuana or any thing [sic] related to drugs, but instead they stared [sic] going in to 'vin' numbers." (Id. at 2.) According to Petitioner, Gates "numerous time [sic] has said that he does not see no [sic] legal bases for . . . suppression of said illegal [sic] obtained evidence." (Id.)

Detective Kroll testified under oath that he observed a Toyota Tacoma bearing a North Carolina license plate execute a left turn into the wrong lane of travel and without using a turn signal, and that he pulled the vehicle over. (Trial Tr. vol. 5 (Doc. 175) at 21.) He identified the driver as Clodoaldo Carranza Rivera ("Rivera"), the front-seat passenger as Ortiz, and the back-seat passenger as an individual with a Virginia driver's license in the name of "Carlos Gonzalez" (who Kroll identified at the trial as Petitioner). (Id. at 22-23.) Detective Kroll further testified that, although a sticker under the hood of the vehicle indicated a 2001 model year, (id. at 28), the vehicle was registered as a 2004 Toyota Tacoma, (id. at 32).

Although Petitioner apparently now denies that the vehicle made such an illegal turn, he did not raise that issue with the trial court during any of the many instances before trial, during trial, and at sentencing on which he complained of the

- 8 -

alleged ineffective assistance of his trial counsel. (See
Sept. 3, 2013 Hr'g Tr. (Doc. 188); Jan. 15, 2014 Hr'g Tr. (Doc.
190); Feb. 24, 2014 Status Conf. Tr. (Doc. 167) at 2-10; Trial
Tr. vol. 7 (Doc. 172) at 30-34; Sentencing Hr'g Tr. (Doc. 154);
Sentencing Hr'g Tr. (Doc. 174) at 6-12.) Even now, Petitioner
does not claim that he informed Gates that the vehicle did not
make an illegal turn or asked Gates to pursue a motion to
suppress on that basis. Moreover, Petitioner did not provide any
explanation as to how he knew, as a back-seat passenger in the
vehicle, that the driver executed the turn into the proper lane
and/or used his turn signal, and did not allege that the driver
(Rivera) or other passenger (Ortiz) would offer such testimony.

Petitioner also appears to question Detective Kroll's
authority, as a member of the Fairfax Police Department's "auto
theft division," to conduct traffic stops. (2255 Pet. (Doc. 216)
at 2.) However, Detective Kroll testified that, as a member of
the Major Crimes Division, he did not typically perform traffic
stops, but that if he observed a traffic violation, he had the
authority to execute the stop. (See Trial Tr. vol. 5 (Doc. 175)
at 36.) Petitioner has provided no information to counter that
testimony. Moreover, to the extent Petitioner insinuates that
Detective Kroll's motivation all along was to stop the vehicle
to look for VIN numbers, that does not dispel the showing of

- 9 -

probable cause necessary for the stop. See United States v.
Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011) ("The decision to
stop an automobile is reasonable where the police have probable
cause to believe that a traffic violation has occurred," and
"[a]ny ulterior motive a police officer may have for making the
traffic stop is irrelevant."), abrogated in part on other
grounds by Rodriguez v. United States, 575 U.S. 348 (2015).

Petitioner further challenges trial counsel's failure "in
cross-examination . . . to confront [D]etective Kroll with the
fact that how [sic] was he familiar with the smell of
marihuana." (2255 Pet. (Doc. 216) Id. at 2.) However, Detective
Kroll did not testify about smelling marijuana in the vicinity
of the vehicle on direct examination. (See Trial Tr. vol. 5
(Doc. 175) at 20-35.) Thus, had trial counsel asked Detective
Kroll about such matters, the jury would have heard for the
first time about the possibility that Petitioner and/or his
companions were using illegal drugs at the time of the stop – a
fact both irrelevant to the charges against Petitioner and
prejudicial to his case.

In short, Petitioner has not shown deficient performance by
his trial counsel, because Petitioner has not demonstrated that
a motion to suppress evidence from the Fairfax search would have
had any chance of succeeding. See Oken v. Corcoran, 220 F.3d

- 10 -

259, 269 (4th Cir. 2000) ("[C]ounsel [is] not constitutionally
ineffective in failing to [take action if] . . . it would have
been futile for counsel to have done so . . . .").

    2.   **Subcontention 2 – Motion to Suppress Evidence
from September 24, 2012 Maryland Traffic Stop**

Petitioner additionally challenges his trial counsel's
failure to file a motion to suppress evidence obtained during a
traffic stop and subsequent search of a vehicle in which
Petitioner was a passenger conducted on September 24, 2012, by
Detective Hooke and David Brickley, a Special Deputy with
Immigration and Customs Enforcement assigned to the United
States Marshal Service Capital Area Regional Fugitive Task
Force. (2255 Pet. (Doc. 216) at 4-5; see also Trial Tr. vol. 5
(Doc. 175) at 58.) Petitioner contends that "Maryland police did
the preliminary search and seizure, subsequently they did
inventory of the evidences [sic] an[d] incident reports and
affidavit," and that "some of the evidences [sic] presented
through out [sic] the testimony of [D]etective Hook[e] . . .
were not part of Maryland inventory, and they were not mentioned
in Maryland's affidavit, neither on incident report." (2255 Pet.
(Doc. 216) at 4 (bold font omitted).) According to Petitioner,
that alleged difference between the Maryland documents and
Detective Hooke's testimony and evidence demonstrates "that said

evidences [sic] had been tampered and some had been planted."
(Id.) Petitioner argues that photographs of a sticker on the
vehicle's door post coming off and of damage around the serial
number stamped on the chassis had been "tampered" with, and that
shipping manifests found in the vehicle containing information
about the three vehicles named in Counts Three, Four, and Five
of the October 29, 2013 Superseding Indictment had been
"planted." (Id.)

Even assuming that the Maryland documents do not reference
the photographs and shipping manifests about which Detective
Hooke testified, Petitioner has proffered no facts supporting
his conclusory and wholly speculative claim that such evidence
had been "tampered" with or "planted." For example, Petitioner
does not identify who tampered with the photographs or in what
manner they were tampered with (particularly given that
Detective Hooke found the photographs on Petitioner's cell
phone). Similarly, Petitioner does not identify who "planted"
the shipping manifests in evidence or how Detective Hooke was
able to learn of the existence at the shipping company of the
three vehicles referenced in Counts Three, Four, and Five of the
October 29, 2013 Superseding Indictment without the discovery of
the shipping manifests in the vehicle. (See Trial Tr. vol. 6
(Doc. 171) at 30-64; Trial Tr. vol. 5 (Doc. 175) at 105-08.)

- 12 -

Those failures of proof preclude relief on this subcontention. See United States v. Dighera, Nos. 97-40072, 06-3026-RDR, 2006 WL 1814360, at *4 (D. Kan. June 29, 2006) (finding the petitioner's "fail[ure] to provide any support for []his contention . . . that [police] officers . . . were engaged in the manufacture of evidence, the destruction of evidence, tampering with evidence and perjury . . . [was] insufficient to warrant relief under § 2255"). Put simply, Petitioner has not shown deficient performance by his trial counsel, because Petitioner has not demonstrated that a motion to suppress evidence from the Maryland search would have had any chance of succeeding. See Oken, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally ineffective in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

Petitioner also alleges "that the shipping company named on the said 'shipping manifest' did not came [sic] to testify about the authenticity of said documentation," and that Gates failed to undertake "any independent effort to verified [sic] the authenticity of [the shipping manifests]." (2255 Pet. (Doc. 216) at 4.) However, Petitioner does not explain the basis for his knowledge that Gates did not conduct any independent investigation of the authenticity of the shipping manifests, nor

- 13 -

does he provide any factual basis for questioning the authenticity of the document or a forecast of what a proper investigation of the manifests would have shown and its impact on his case. See United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989) (providing that "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"). Petitioner simply has not shown that Gates' decision not to challenge the authenticity of the manifest constituted constitutionally deficient performance. See Strickland, 466 U.S. at 691 (deeming strategic decisions by counsel virtually unchallengeable); Alvord v. Wainwright, 469 U.S. 956, 960 n.5 (1984) (holding that decision of which witnesses to call is "the exclusive province of the lawyer").

### 3. Subcontention 3 - Impeachment of Heber Mauricio Teo Gudiel

In Subcontention 3, Petitioner maintains that trial counsel performed ineffectively by failing to show witness Heber Mauricio Teo Gudiel ("Gudiel") Government's Exhibit 145K (a photograph of a four-door silver 2004 Toyota Tacoma found on Petitioner's cell phone seized by Detective Hooke on April 3, 2012) and Government's Exhibit 23A (a photograph taken by

Detective Hooke of a silver Toyota Tacoma at the 706 Ellis Road warehouse that Detective Hooke examined and found "remarkably similar" to the vehicle pictured in Government's Exhibit 145K). (See 2255 Pet. (Doc. 216) at 5 (referencing Trial Tr. vol. 6 (Doc. 171) at 21-22).) Petitioner notes that Gudiel testified that his stolen 2004 Toyota Tacoma had two doors. (Id. (referencing Trial Tr. vol. 7 (Doc. 172) at 16-17, 19).) Petitioner contends that the four-door Tacoma pictured in Exhibits 23A and 145K is the same vehicle Petitioner was charged with storing and concealing in Count Seven of the October 29, 2013 Superseding Indictment. Petitioner thus argues that, had Gates shown Gudiel Exhibits 23A and 145K, he would have testified that they did not depict his stolen Tacoma, and the Government would not have been able to prove that the vehicle named in Count Seven was in fact stolen. (2255 Pet. (Doc. 216) at 5.)

As an initial matter, Detective Hooke testified to viewing three different photographs on Petitioner's cell phone of wrecked Toyota Tacomas, all three of which bore striking similarity to vehicles he had personally observed at the 706 Ellis Road warehouse. (See Trial Tr. vol. 6 (Doc. 171) at 19-21 (referencing Government Exhibits 23A, B, and C and 145I, J, and K).) The first two Tacomas Detective Hooke discussed did not

- 15 -

include a description of whether they had two or four doors. Thus, Petitioner has not shown that the third Tacoma Detective Hooke discussed, which he described as "four-door," constitutes the same vehicle charged in Count Seven of the October 29, 2013 Superseding Indictment.

Furthermore, Petitioner's argument glosses over the fact that Gates elicited the testimony from Gudiel on cross-examination that his Toyota Tacoma had two doors. (See Trial Tr. vol. 7 (Doc. 172) at 16-17, 19.) Thus, that answer enabled Gates to argue in closing, if he deemed such argument strategically reasonable, that the Government had failed to establish that the vehicle named in Count Seven was stolen. Petitioner does not allege that either he or Gates knew what Gudiel would say if shown photographs of the four-door Tacoma, and this court will not second-guess the strategic decisions of trial counsel as to which questions to ask a witness. See Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985) ("[T]he presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain.").

### 4. Subcontention 4 – Impeachment of Detective Kroll

In his fourth ineffective assistance Subcontention, Petitioner complains that Gates should have called Ortiz,

- 16 -

Rivera, and Jose Walter Carranza to "provide[] impeaching material and evidences [sic]" against Detective Kroll. (2255 Pet. (Doc. 216) at 6.) That argument fails as conclusory, as Petitioner neither identified what testimony or evidence such individuals would provide nor explained how such evidence would raise a reasonable probability of a different outcome. See Nickerson, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."); see also Alexander, 775 F.2d at 602 (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain").

Petitioner also maintains that Gates should have called an expert witness to testify about the meaning of "total loss" and to explain the process of salvage automobile repair, i.e., that "replacement pieces could have been used or after market auto-parts" which "would have produced a mismatch with the original 'vin' number of the vehicle." (2255 Pet. (Doc. 216) at 6-7.)

- 17 -

However, such testimony would not have raised a reasonable probability of a different outcome, in light of:

- the testimony from Othman detailing Petitioner's roles in the chop shop operation of stealing vehicles, purchasing wrecked vehicles at auction, switching the VIN numbers from wrecked vehicles to the stolen vehicles, and reselling the vehicles and scrap parts, (see Trial Tr. vol. 4 (Doc. 170) at 49-92, 99, 108-09);

- the testimony of Michelle Wicker that in July 2012 her home surveillance camera captured two men stealing her 2003 Toyota Corolla out of her driveway and that she sent the footage to a local television station, (see id. at 157-67);

- the testimony of Rodney Cannady that Wicker's surveillance footage depicts him and Petitioner stealing Wicker's car, and that Cannady served as lookout while Petitioner broke into the vehicle. (see id. at 175-76); and

- the testimony of Othman that Petitioner identified himself in Wicker's security camera footage that had appeared on the local news, (see id. at 65).

That evidence overwhelmingly belies an innocent explanation for the evidence adduced at trial regarding mismatching VIN numbers. See United States v. Dyess, 730 F.3d 354, 362 (4th Cir. 2013) (holding that the petitioner could not "show prejudice"

- 18 -

where "[t]he Government had overwhelming evidence of [the petitioner's] guilt," including "co-conspirator testimony").

###### 5.    **Subcontention 5 – Impeachment of Detective Hooke**

Next, Petitioner faults trial counsel for failing to move to exclude Detective Hooke from the courtroom during the testimony of other Government witnesses. (2255 Pet. (Doc. 216) at 7-8.) That argument fails for the simple reason that, as Petitioner concedes, (see id. at 7), the Government received the court's permission to have Detective Hooke remain in the courtroom during the trial as an essential witness under Rule 615(c) of the Federal Rules of Evidence. Petitioner provides no facts in support of his bald allegations "that the sole purpose [of keeping Detective Hooke in the courtroom] was for him to be listening to other witnesses [sic] testimony in order that he could match his testimony," (id.), and that "the Government did not needed [sic] [D]etective Hook[e]'s assistance he [sic] could have get [sic] whatever assistance he needed from some one else," (id. at 8). See Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.").

Petitioner additionally maintains that Gates should have challenged Detective Hooke's testimony regarding photographs and

- 19 -

videos from cell phones seized during the Fairfax traffic stop depicting activities taking place at 924 Carter Avenue as speculative and irrelevant and should have ensured that a proper limiting instruction was given. (2255 Pet. (Doc. 216) at 8.) The record demonstrates that as Detective Hooke testified about those photographs and videos, (see Trial Tr. vol. 5 (Doc. 175) at 115-23; Trial Tr. vol. 6 (Doc. 171) at 16-19), Gates did object twice on grounds of relevance, (see Trial Tr. vol. 5 (Doc. 175) at 120, 123-24; see also Trial Tr. vol. 6 Doc. 171) at 9), and the court ultimately overruled those objections, (see Trial Tr. vol. 5 (Doc. 175) at 121; Trial Tr. vol. 6 (Doc. 171) at 10-11). Accordingly, Petitioner has not shown that Gates' performance was deficient in that regard.

Petitioner complains that Gates failed to call Ortiz, Larios, Rivera, an expert witness, and the owners of automobile repair businesses located at 924 Carter Avenue who "could have testified the step [sic] they took or to describe [sic] how they fixed a car." (2255 Pet. (Doc. 216) at 8.) However, given that Ortiz and Larios pled guilty to the charges against them in this matter, Petitioner has fallen far short of showing that they would have offered innocent explanations for the images in question of activities at 924 Carter Avenue. Moreover, such testimony would not have raised a reasonable probability of a

- 20 -

different outcome, in light of the damaging testimony, outlined above, from Othman, Wicker, and Cannady, which overwhelmingly establishes Petitioner's guilt. See Dyess, 730 F.3d at 362 (holding that the petitioner could not "show prejudice" where "[t]he Government had overwhelming evidence of [the petitioner's] guilt," including "co-conspirator testimony").

Additionally, Petitioner argues that Gates should have objected to Detective Hooke's testimony about events that occurred at the traffic stop in Maryland on September 24, 2012, prior to his arrival on the scene. (2255 Pet. (Doc. 216) at 8-9.) However, contrary to Petitioner's allegations, Detective Hooke did not testify to any events of which he lacked personal knowledge:

> Q. . . . [I]n Virginia, the only time you've had occasion to interact with the defendant?
>
> A.   No, sir, several months later, I had an interaction with the defendant in the state of Maryland.
>
> Q.   And were you present just a moment ago for the testimony of David Brickley?
>
> A.   Yes, sir, I was present for Agent Brickley's testimony.
>
> Q.   And are you familiar with the traffic stop which he described?
>
> A.   I am, sir.
>
> Q.   How are you familiar with that traffic stop?

- 21 -

A.    Agent Brickley had located the vehicle with the
defendant in it and called me to notify me that he was
able to locate the defendant and requested that I
respond to the location.

Q.    And did you travel to the location of that
traffic stop?

A.    Myself and two other Fairfax County detectives
responded to that location.

Q.    And when you arrived, was -- when you arrived,
other than law enforcement, were there any individuals
present?

A.    There were, sir.

Q.    And who was present at the time of your arrival?

A.    The defendant, Steve Turner, Edwin Ortiz
Rodriguez, and a woman by the name of -- I believe
Nelly Francesca. I don't remember the name exactly.

Q.    Now, did you have occasion to perform any sort of
examination of the vehicle involved in that traffic
stop?

A.    I did, sir.

Q.    And was that examination done on the side of the
road, or was it done at some later time?

A.    Both, sir.

Q.    And were photographs taken during the examination of
that vehicle?

A.    Yes, sir.

(Trial Tr. vol. 5 (Doc. 175) at 92-94.)

###### 6. **Subcontention 6 – Impeachment of Detective Sean Brodrick**

Petitioner argues that Gates should have challenged Detective Sean Brodrick's testimony that the engine in the Toyota 4Runner stopped in Maryland on September 24, 2012, in which Petitioner was a passenger, did not match the VIN number on the vehicle. (2255 Pet. (Doc. 216) at 9.) In support of that argument, Petitioner noted that "[t]he argument and principals stated on [his] fourth [Subcontention] apply here by references [sic]." (Id.) However, as discussed in the context of Petitioner's fourth Subcontention of ineffective assistance, calling an "expert witness" to testify about the meaning of "total loss" and to explain the process of salvage automobile repair would not have raised a reasonable probability of a different outcome, in light of the damaging testimony, outlined above, from Othman, Wicker, and Cannady. That evidence overwhelmingly belies an innocent explanation for the evidence adduced at trial regarding mismatching VIN numbers. See Dyess, 730 F.3d at 362 (holding that the petitioner could not "show prejudice" where "[t]he Government had overwhelming evidence of [the petitioner's] guilt," including "co-conspirator testimony").

Subcontention 7 maintains that Gates performed deficiently by failing to file a motion to suppress evidence obtained by Durham Police during a search of an industrial warehouse complex at 1617 Ellis Road. (2255 Pet. (Doc. 216) at 10.) According to Petitioner, the vehicle emitting the Lo-Jack signal was not in plain view, and Officer Nicholas Lynde "never said that he ask [sic] permissions [sic] to any body [sic] to go in to [sic] the property and search around to look for said stolen vehicle." (Id.) Petitioner further contends that Officer Lynde testified that he could not see the public VIN number on the stolen vehicle and "[a]t the [sic] point he was supposed to execute a search warrant to conduct further investigation, but in stead [sic] he opted for breaking into the vehicles." (Id.)

As an initial matter, Petitioner has not shown that he had sufficient standing, e.g., a possessory interest at 1617 Ellis Road, to contest the search. See Rakas v. Illinois, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." (citing Alderman v. United States, 394 U.S. 165, 174 (1969))).

- 24 -

Moreover, Officer Lynde testified that he drove his marked patrol car into the 1617 Ellis Road complex through an <u>open</u> gate, and that the Lo-Jack signal led him to a silver Toyota 4Runner parked in a <u>field</u>. (Trial Tr. vol. 2 (Doc. 168) at 29-42.) Officer Lynde did not testify that he "broke" into any vehicles in the field. (<u>Id.</u>) Thus, even if Petitioner had standing to contest the search, he has not shown that Gates would have had any basis for bringing the suppression motion. <u>See</u> <u>Oken</u>, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally ineffective in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

### 8.    <u>Subcontention 8 — Impeachment of Officer Nicholas Lynde</u>

Via his eighth Subcontention of trial counsel's ineffective assistance, Petitioner faults Gates for failing to ask Officer Nicholas Lynde why the Lo-Jack signal on a stolen Toyota 4Runner took 15 days after Lo-Jack personnel activated it to hit the tracking device in Officer Lynde's patrol car, and for not asking the vehicle's owner, Darren Roberts, if he had installed a Lo-Jack device in the 4Runner. (2255 Pet. (Doc. 216) at 11.)

Petitioner's argument fails to establish deficient performance by Gates, because he has not explained why the 15-day delay in the Lo-Jack signal reaching Officer Lynde's

- 25 -

tracking device merited further investigation by Gates. See Green, 882 F.2d at 1003 (providing that "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"). Moreover, Petitioner has not shown that Roberts would have, in fact, testified that he did not install a Lo-Jack in his 4Runner. Thus, the possibility existed that, had Gates asked Roberts about the Lo-Jack, and had Roberts confirmed that his vehicle did contain a Lo-Jack, his response would have corroborated Officer Lynde's testimony. See Alexander, 775 F.2d at 602 ("[T]he presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain").

Petitioner also complains that Gates should have called an expert witness to impeach Officer Lynde's testimony. (2255 Pet. (Doc. 216) at 11.) Officer Lynde testified that "the screws that attached the public VIN [on a red Toyota Tacoma next to Roberts' stolen 4Runner] [he] could tell had been screwed in and screwed out" because "[t]he paint that was on them was chipped away," (Trial Tr. vol. 2 (Doc. 168) at 37-38), and that he found a VIN number "on the firewall between the passenger compartment and

- 26 -

the engine block," (id. at 39). Petitioner conclusorily contends that "an expert witness could have testified that Toyotas [sic] manufacturer do [sic] not use screws to hold said 'Vin' number plate" and "do [sic] not stamp 'Vin' numbers on the fire wall." (2255 Pet. (Doc. 216) at 11.) Petitioner provides no support for that assertion, see Alexander, 775 F.2d at 602 ("[T]he presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain"), and in any event, such testimony would have little impact on the case given Othman's damaging testimony regarding Petitioner's role in the chop shop operation as involving the switching of VIN numbers between wrecked vehicles purchased at auction and stolen vehicles, see Dyess, 730 F.3d at 362 (holding that the petitioner could not "show prejudice" where "[t]he Government had overwhelming evidence of [the petitioner's] guilt," including "co-conspirator testimony").

### 9. Subcontention 9 – Impeachment of Othman

Petitioner next asserts that trial counsel failed to impeach Othman with statements he made "either to arresting officers or to the transporter's detectives that took him to Durham, NC" that "contradict[ed] what [Othman] testified during [Petitioner]'s trial." (2255 Pet. (Doc. 216) at 12.) However,

Petitioner has not offered a single example of a contradiction between Othman's alleged statements to officers and his trial testimony. See Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.").

Petitioner further maintains that Gates failed to call Rivera, Larios, Ortiz, the arresting officers, and the transporting detectives who "could have produce [sic] impeaching material and evidences [sic]" and should have called "witness[es] . . . from 924 location" and Walter Carranza who "could have produce [sic] favorable evidences [sic] to [Petitioner]'s defense," (2255 Pet. (Doc. 216) at 12), such as "support[in]g the version that [] payments [on Othman's phone] were for legal activities," (id. at 13). Petitioner has entirely failed to identify the "favorable testimony" those witnesses would have provided. See Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."). Moreover, given that Larios and Ortiz pled guilty to the charges against them in this matter, Petitioner has fallen far short of showing that they would have offered innocent explanations for the payment information found on Othman's cell phone.

- 28 -

### 10. <u>Subcontention 10 – Sequestration of Charles Bagley</u>

In his tenth Subcontention of ineffective assistance, Petitioner faults Gates for failing to object to the fact that witness Jerel Deandre Bagley (listed as "Charles Bagley" in the trial transcript, (Trial Tr. vol. 4 (Doc. 170) at 123)) was present in the courtroom during the testimony of Othman. (<u>See</u> 2255 Pet. (Doc. 216) at 13.) In that regard, Petitioner asserts that the "sole purpose" of Bagley's presence during Othman's testimony was "to listen, and match their testimony." (<u>Id.</u>) However, Petitioner has not provided any facts in support of that bald allegation, and in particular, has not pointed to any specific testimony by Bagley that Petitioner contends was falsified in order to "match" Othman's testimony. <u>See</u> <u>Dyess</u>, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.")

### 11. <u>Subcontention 11 – Sequestration of Wilkerson</u>

Via Subcontention 11, Petitioner argues that Gates should have objected to the fact that Wilkerson was present in the courtroom during the testimony of Othman and Bagley "with the sole purpose of matching the testimony." (2255 Pet. (Doc. 216) at 14.) However, Petitioner has not provided any facts in

- 29 -

support of that bald allegation, and in particular, has not pointed to any specific testimony by Wilkerson that Petitioner contends was falsified in order to "match" the testimony of Othman or Bagley. See Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.")

### 12.   Subcontention 12 – Impeachment of Rodney Cannady

Petitioner, in Subcontention 12, challenges Gates' failure to object to the testimony of Rodney Cannady as irrelevant, because the incident about which Cannady testified "was not part of the indictment, and neither any piece of evidence of [the victim Michelle A. Wicker]'s car was found at the alleged warehouse nor any ties to the places alleged where the conspiracy took place." (2255 pet. (Doc. 216) at 14.) As outlined above, Cannady testified that he stole Wicker's car with Petitioner and identified himself and Petitioner in Wicker's surveillance camera footage of the theft of her vehicle. Any objection by Gates on grounds of relevance would have been futile, as that evidence is highly probative to corroborate the testimony of Othman that one of Petitioner's primary roles in the chop shop operation was to steal cars. Oken, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally

- 30 -

ineffective in failing to [take action if] . . . it would have
been futile for counsel to have done so . . . .").

Additionally, Petitioner faults trial counsel for failing
to "object[] to the admissibility of [] Cannady's testimony on
the bases that the jurors will not be proper [sic] apprized
[sic] on the bases and facts behind the motivations for []
Cannady's testimony" and to the "fact that [] Cannady was
testifying under false promises and that he did not know that
[his immunity agreement and plea agreement] had not been
signed." (Doc. 216 at 15.) However, the record demonstrates that
the court sustained Gates' objection to Cannady's plea
agreement, that the jury heard testimony about Cannady's
immunity agreement on direct examination, (see Trial Tr. vol. 4
(Doc. 170) at 168-72), and that Gates cross-examined Cannady
effectively regarding his motivation for testifying:

    Q.   Mr. Cannady, what, if anything, do you hope to
    gain from your testimony here today?

    A.   Sir?

    Q.   What do you hope to gain from your testimony here
    today?

    A.   My freedom back.

    Q.   Your freedom. How will this testimony lead to
    your freedom?

    A.   I mean, I really didn't hardly do nothing. I
    don't know.

- 31 -

Q.   You don't know how it will lead to your freedom?

A.   By me testifying.

Q.   So you hope it will lead to your freedom?

A.   Yes, sir.

(Id. at 177.) That cross-examination then enabled Gates to make the following argument in closing:

> There was one honest man among the participants in the Ellis Road operation, Rodney Cannady. When I asked him what he expected to get from his testimony, he said "my freedom." When your freedom is at stake, there's a powerful incentive to say whatever it takes to please the person who holds the key to your cell. Cannady had no qualms about stealing cars. Why should he care about telling the truth when his freedom is at stake?

(Tr. Closing Args. & Jury Instrs. (Doc. 196) at 23-24.) Petitioner simply has not shown deficient performance by Gates regarding Cannady's testimony.

### 13.   <u>Subcontention 13 — Sequestration of Turner</u>

Next, Petitioner maintains that trial counsel provided ineffective assistance by failing to object to the presence of Turner in the courtroom during the testimony of "other witnesses . . . in order for him to match their testimony." (2255 Pet. (Doc. 216) at 16.) However, Petitioner has not provided any facts in support of that bald allegation, and in particular, has not identified which "witnesses'" testimony Turner was present

- 32 -

for or pointed to any specific testimony by Turner that
Petitioner contends was falsified in order to "match" other
"witnesses'" testimony. See Dyess, 730 F.3d at 362 ("[V]ague and
conclusory allegations contained in a § 2255 petition may be
disposed of without further investigation by the District
Court.")

### 14. <u>Subcontention 14 — Impeachment of Officer Michael D. Mues</u>

Subcontention 14 contends that trial counsel failed
Petitioner by not objecting on grounds of relevance to the
testimony of Durham Police Officer Michael D. Mues that, on
June 24, 2010, he followed a Lo-Jack signal hit to a stolen
vehicle located at 924 Carter Avenue, because it "did not
established [sic] any connection with any body [sic] alleged on
the conspiracy." (2255 Pet. (Doc. 216) at 16.) Contrary to
Petitioner's assertions, other testimony in the case establishes
the connection between 924 Carter Avenue and Petitioner and the
conspiracy in general:

- the testimony of Othman that, when he met Petitioner
in the summer of 2011, he was working at 924 Carter Avenue and
then moved his business in with Othman's at 706 Ellis Road in
March 2012, (Trial Tr. vol. 4 (Doc. 170) at 50-52);

- the testimony of Detective Hooke that photographs on Petitioner's cell phone seized during the April 3, 2012 Fairfax traffic stop showed dismantled and disassembled vehicles at 924 Carter Avenue, (Trial Tr. vol. 5 (Doc. 175) at 123-25; Trial Tr. vol. 6 (Doc. 171) at 16-19).

In addition, Petitioner challenges Gates' failure to object to Officer Mues' testimony regarding evidence of stolen vehicles he found at 924 Carter Avenue on the basis that he "broke in to [sic] the property," (2255 Pet. (Doc. 216) at 16), and conducted an "illegal search," (id. at 17). Petitioner has not established deficient performance by Gates, because Officer Mues testified that, when he pulled up to the locked gate at 924 Carter Avenue in his marked patrol car, individuals who either worked or lived at the property "asked what I was doing or what we were doing," and that Officer Mues "explained to them we had a Lo[-]Jack hit, and there was a stolen vehicle inside the fence." (Trial Tr. vol. 4 (Doc. 170) at 200.) According to Officer Mues, "[t]he guy went inside, got a key, and let us in." (Id.) Thus, Officer Mues' testimony clearly establishes he had the consent of an occupant (who possessed a key to the gate) to enter the property, and any objection to that testimony on the grounds of an illegal search would have been futile. Oken, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally ineffective in failing to

- 34 -

[take action if] . . . it would have been futile for counsel to
have done so . . . .") Moreover, Petitioner provides <u>no</u> factual
basis for his unsubstantiated hunch that Mues fabricated the
existence of the occupant who let him in and "broke in to [sic]
the property," (2255 Pet. (Doc. 216) at 16). See <u>Dyess</u>, 730 F.3d
at 362 ("[V]ague and conclusory allegations contained in a §
2255 petition may be disposed of without further investigation
by the District Court.")

### 15. <u>Subcontention 15 – Impeachment of Shemeles Abraham</u>

Next, Petitioner complains that Gates failed to object to
the testimony of Shemeles Abraham, the owner of the Toyota
4Runner discovered by Officer Mues at 924 Carter Avenue, on the
grounds that the "testimony [did not] make any connection to
[Petitioner] or any member of the alleged conspiracy or tied
said incident to any particular one of the 12 different
business[es] at 924 Carter Avenue." (2255 Pet. (Doc. 216) at
17.) That allegation fails because, as discussed above in
connection with Subcontention 14, other evidence in the case
provides a link between Mues' testimony (and therefore, by
extension, Abraham's testimony) to Petitioner and the
conspiracy. See <u>Oken</u>, 220 F.3d at 269 ("[C]ounsel [is] not
constitutionally ineffective in failing to [take action if] . .

- 35 -

. it would have been futile for counsel to have done so
. . . .").

### 16. Subcontention 16 — Impeachment of Detective Kevin Wright

In Subcontention 16, Petitioner contends that Gates should have objected to the testimony of Detective Kevin Wright that, when he arrested Ortiz at 924 Carter Avenue, he saw Ortiz near a Toyota Tacoma, because Detective Wright was "not even close to tied [sic] or establish [sic] any connection between Ortiz and the [Tacoma] and much less with [Petitioner] or any member of the alleged conspiracy." (2255 Pet. (Doc. 216) at 18.) Detective Wright testified that, on May 22, 2012, he and other officers "were directed to 924 Carter by . . . Detective Hooke in reference to an auto theft ring," (Trial Tr. vol. 4 (Doc. 170) at 210-11), and encountered Ortiz standing in front of Bay 7 near "a Toyota Tacoma that was taken apart, [with] a tarp over it." (Id. at 211.) Detective Wright further testified that, upon his examination of the Tacoma, he observed that "the vehicle was stripped of all its interior[,] . . . somebody had taken a grinder to what appeared to be serial numbers on the frame of the vehicle," that there was "[n]o license plate on the vehicle," and that "[t]he ignition was also grossly taken apart,

- 36 -

and the stickers that had VIN numbers on them on the inside of the doorjamb were also removed." (Id. at 212.)

Petitioner's argument glosses over the fact that Detective Hooke, who had directed Detective Wright to assist in the investigation of an auto theft ring at 924 Carter Avenue on May 22, 2012, testified that photographs on Ortiz's cell phone seized during the April 3, 2012 Fairfax traffic stop and search showed Ortiz at 924 Carter Avenue and a video from that cell phone showed Ortiz driving an All-Terrain Vehicle ("ATV") at 924 Carter Avenue. (See Trial Tr. vol. 5 (Doc. 175) at 117-23.) Othman also testified that Ortiz was a participant in the chop shop operation at 706 Ellis Road. (See Trial Tr. vol. 4 (Doc. 170) at 53.) The testimony of Detective Hooke and Othman thus establishes the link between Detective Wright's testimony and Ortiz, Petitioner, and the conspiracy in general, and any objection by Gates to the relevance of Detective Wright's testimony would have failed. Oken, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally ineffective in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

Petitioner additionally claims that Gates should have called witnesses at 924 Carter Avenue and an expert witness to explain that Ortiz was "fixing said truck and that in order to

- 37 -

fixed [sic] the truck, it was required to empty the cab." (2255
Pet. (Doc. 216) at 18.) That claim falls short, because
Petitioner neither identifies any "witnesses at 924 Carter
Avenue" who Gates should have called, nor provides a foundation
for his knowledge of what such unidentified witnesses would have
testified to at trial. See Alexander, 775 F.2d at 602
(ineffective assistance claims "based upon uncalled witnesses
[are] not favored because the presentation of witness testimony
is essentially strategy and thus within the trial counsel's
domain, and . . . speculation[] as to what [certain] witnesses
would have testified is too uncertain"). Moreover, such
testimony would not have raised a reasonable probability of a
different outcome, in light of the damaging testimony, outlined
above, from Othman, Wicker, and Cannady, which overwhelmingly
establishes Petitioner's guilt. See Dyess, 730 F.3d at 362
(holding that the petitioner could not "show prejudice" where
"[t]he Government had overwhelming evidence of [the
petitioner's] guilt," including "co-conspirator testimony").

Petitioner also maintains that Gates should have
interviewed Ortiz and Larios who "could have produce [sic]
impeaching material and evidences [sic] that could impeach
[D]etective Wright's testimony." (2255 Pet. (Doc. 216) at 18.)
However, given that Ortiz and Larios pled guilty to the charges

- 38 -

against them in this matter, Petitioner has fallen far short of showing that they would have offered innocent explanations for the activities at 924 Carter Avenue to which Detective Wright testified. See Alexander, 775 F.2d at 602 (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain").

### 17. Subcontention 17 – Impeachment of Detective Christopher N. Walker

Via Subcontention 17, Petitioner challenges his trial counsel's failure to object to the testimony of Detective Christopher N. Walker on grounds of relevance and because he lacked probable cause to enter the property at 706 Ellis Road in September 2012. (2255 Pet. (Doc. 216) at 19.) Officer Walker testified that, at about 4:30 or 5:00 in the morning during his night shift in September 2012, he was patrolling his district which included the complex at 706 Ellis Road and noticed that the gate to the property was open for the first time, and that he usually found it closed at night. (See Trial Tr. vol. 4 (Doc. 170) at 205-07, 209.) Officer Walked stated that he entered the property "to conduct a property check," passed by building

number 20, and noticed two vehicles parked out front, as well as that the door to the warehouse was open and lights were on. (Id. at 208.)

Petitioner's contentions do not establish deficient performance by trial counsel, because as Petitioner acknowledges, "[t]his incident apparently happened one or two weeks prior to discovered [sic] the alleged chop-shop in this property [at] Elli[s] Road," (2255 Pet. (Doc. 216) at 19), and thus, Officer Walker's testimony tends to show a shift in activity at 706 Ellis Road, i.e., an open gate to the complex and active operations at building number 20 during the early morning hours, shortly before Durham Police executed search warrants at 706 Ellis Road, (see Trial Tr. vol. 2 (Doc. 168) at 56). Furthermore, Petitioner does not explain how that evidence prejudiced him.

Moreover, any objection to Officer Walker's testimony on the ground he lacked probable cause to enter the property at 706 Ellis Road would have failed, as Officer Walker's testimony made clear that he restricted his movements to places visitors would be expected to go. See Carroll v. Carman, 574 U.S. 13, 18 (2014) ("[W]hen the police come on to private property . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from

- 40 -

such vantage points are not covered by the Fourth Amendment."
(first quoting <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 519 (3d
Cir. 2003); then quoting 1 Wayne R. LaFave, <u>Search & Seizure, A
Treatise On The Fourth Amendment</u> § 2.3(f) (3d ed. 1996 and Supp.
2003))).

### 18. **Subcontention 18 – Motion to Dismiss Conspiracy Count**

Via Subcontention 18, Petitioner maintains that trial
counsel failed him by not "mov[ing] for dismissal of the case on
the ground that the Government failed to establish the beginning
of the conspiracy" in 2010 at 924 Carter Avenue. (2255 Pet.
(Doc. 216) at 20.) In support of that argument, Petitioner
"assume [sic] that Government Theory when the conspiracy stared
[sic] is based on the testimony of Victor Gonzalez
[('Gonzalez')] or some how [sic] related with the Toyota Scion
that the Government alleged that [Petitioner] sold to [] 
Gonzalez," and notes that Gonzalez did not purchase the vehicle
at 924 Carter Avenue, (<u>id.</u> at 19), but rather at a shop called
Pedigree and that "[n]ot a single document or 'DMV' records were
presented that [Petitioner] had sold a vehicle to [] Gonzalez,"
(<u>id.</u> at 20).

Case 1:13-cr-00230-WO   Document 239   Filed 09/28/20   Page 41 of 75

Contrary to Petitioner's allegations, the following evidence supports the Government's theory that the conspiracy began in 2010 at 924 Carter Avenue:

- Don Purdy ("Purdy"), Regional Operations Manager for Copart, an online auto auction company, testified regarding "gate passes" and bills of sale for vehicles purchased at auction by "Alex Ramirez" from March 15, 2010, to June 5, 2012, (see Trial Tr. vol. 6 (Doc. 171) at 92-112);

- Officer Mues testified that he tracked a Lo-Jack signal to a stolen vehicle located at 924 Carter Avenue on June 24, 2010, (see Trial Tr. vol. 4 (Doc. 170) at 196-202);

- Othman testified that, when he met Petitioner in the summer of 2011, he was working at 924 Carter Avenue and subsequently moved in with Othman's chop shop operations at 706 Ellis Road in March of 2012, (see id. at 50-52), and that "Alex Ramirez" was Petitioner's alias, (id. at 54);

- Detective Hooke testified that photographs on Petitioner's cell phone seized during the April 3, 2012 Fairfax traffic stop showed dismantled and disassembled vehicles at 924 Carter Avenue, (see Trial Tr. vol. 5 (Doc. 175) at 123-25; Trial Tr. vol. 6 (Doc. 171) at 16-19);

- 42 -

- North Carolina Division of Motor Vehicles, License and Theft Bureau employee Michael Ciampa ("Ciampa") testified that he recovered a stolen 2005 Toyota Scion in October 2012 that belonged to Robert Scott Smith ("Smith"), and that the vehicle bore a VIN number from a 2006 Scion purchased at Copart by "Alex Ramirez" on <u>November 22, 2010,</u> (<u>see</u> Trial Tr. vol. 6 (Doc. 171) at 136-45; <u>see also</u> <u>id.</u> at 106-07 (Purdy), 119-25 (Smith)); and

- Gonzalez, the owner of the 2005 Scion at the time of its recovery in October 2012, testified that he purchased the car from Petitioner, (<u>see</u> <u>id.</u> at 74-77).

Petitioner's arguments thus fail to show ineffective assistance by Gates, because he has not shown that a motion to dismiss the conspiracy count would have succeeded. <u>See</u> <u>Oken</u>, 220 F.3d at 269 ("[C]ounsel [is] not constitutionally ineffective in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

### 19. <u>Subcontention 19 — Impeachment of Michael Ciampa</u>

Petitioner next claims that his trial counsel provided ineffective assistance by failing to challenge Ciampa's testimony that the Toyota Scion registered to Gonzalez "was stolen and belonged to . . . Smith" and that "the 'Vin' number that was registered in [] Gonzalez's [Toyota Scion] did not matched [sic] the inboard computer." (2255 Pet. (Doc. 216) at

- 43 -

21.) According to Petitioner, Gates should have called expert witnesses that "could have testified that the inboard computer is just one minor component that can not [sic] determine for sure the status of a vehicle (stolen or not stolen), . . . [and] that the inboard computer is frequently replaced and once it is replaced, it will be a mismatch especially if the one replaced [sic] with is[] after market, used, rebuild [sic], reconstructed or the ones known as knockoff auto parts." (Id.)

That claim falls short, because Petitioner does not provide any foundation for his knowledge of what such unidentified expert witnesses would have testified to at trial. See Alexander, 775 F.2d at 602 (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain"). Moreover, such testimony would not have raised a reasonable probability of a different outcome, in light of the testimony, outlined above, from Ciampa, Purdy, Gonzalez, and Smith that demonstrates Petitioner's complicity in the stolen 2005 Toyota Scion and, more generally, the damaging testimony of Othman, Wicker, and Cannady, which overwhelmingly establishes Petitioner's guilt of participation in the conspiracy. See

- 44 -

Dyess, 730 F.3d at 362 (holding that the petitioner could not "show prejudice" where "[t]he Government had overwhelming evidence of [the petitioner's] guilt," including "co-conspirator testimony").

Petitioner further faults Gates for not questioning Gonzalez "if he had take [sic] his car to a mechanical shop for some repairs after he purchased the vehicle." (2255 Pet. (Doc. 216) at 21.) However, Gates was not ineffective because Petitioner has not established that Gonzalez would have, in fact, testified that he took his 4Runner to a mechanical shop for repairs that involved the inboard computer. Thus, the possibility existed that, had Gates asked Gonzalez about repairs to the inboard computer, and had Gonzalez denied such repairs, his response would have corroborated Ciampa's testimony. See Alexander, 775 F.2d at 602 (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculation[] as to what [certain] witnesses would have testified is too uncertain").

### 20. **Subcontention 20 – Investigation**

Via Subcontention 20, Petitioner "contend [sic] that Gates' [sic] had entirely failed to conduct any independent

- 45 -

investigation to verified [sic] the veracity, accuracy, and
legitimate, constitutionality of the evidences [sic] end [sic]
how they were obtained" and "had not conduct [sic] any
investigation at all plain and simple nothing." (2255 Pet. (Doc.
216) at 22.)  Those allegations fail as utterly conclusory. See
Green, 882 F.2d at 1003 (providing that "[a] defendant who
alleges a failure to investigate on the part of his counsel must
allege with specificity what the investigation would have
revealed and how it would have altered the outcome of the
trial"); Dyess, 730 F.3d at 362 ("[V]ague and conclusory
allegations contained in a § 2255 petition may be disposed of
without further investigation by the District Court.").

### 21.  **Subcontention 21 - Pretrial Motions and Expert Witnesses**

Next, Petitioner maintains that "Gates failed to subject
the prosecution's case to meaningful adversarial testing, . . .
did not contest anything[,] . . . did not filed [sic] any pre-
trial motions[,] . . . and [p]urportedly ignored the fact that
an expert witness was fundamentally required and some other
witnesses that could have been available." (2255 Pet. (Doc. 216)
at 22.) Those allegations fail as utterly conclusory. See Green,
882 F.2d at 1003 (providing that "[a] defendant who alleges a
failure to investigate on the part of his counsel must allege

- 46 -

with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"); Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.").

### 22. **Subcontention 22 – Grand Jury Materials**

Subcontention 22 contends that "Gates totally refused to inform [Petitioner] of the constitutionality of the Grand jury proceedings even though requested by [him], and even though [he] acknowledged [sic] him that he had many concern [sic] about how he got indicted." (2255 Pet. (Doc. 216) at 22.) Further, Petitioner asserts that Gates denied Petitioner's request "to see the Grand jury material." (Id.) Those assertions miss the mark, for reasons well-explained by a neighboring district court:

> The . . . Fourth Circuit held, in United States v. Anderson, 481 F.2d 685, 692 (4th Cir. 1973)[]:
>
>> Except for his own testimony, a defendant is not entitled of right to pre-trial access to the testimony before the grand jury: The obligation of the Government is merely to make available to the defendant the testimony of a witness before the grand jury at the conclusion of the direct testimony of such witness at trial and then only if the defendant shows a "particularized need" for such disclosure.

Further, "Federal Rule Crim. Proc. 6(e) codifies the requirement that grand jury activities generally be kept secret[.]" <u>Douglas Oil Co. of California v. Petrol Stops Nw.</u>, 441 U.S. 211, 219 n.9 (1979). . . . Petitioner does not allege any exception to Federal Rule of Criminal Procedure 6 and offers no reason why he is entitled to grand jury evidence. Thus, [trial counsel] was not ineffective for failing to obtain grand jury evidence.

<u>Butler v. United States</u>, Civil Action No. DKC 16-0330, Criminal Case No. DKC 12-0116, 2019 WL 3717681, at *5-6 (D. Md. Aug. 6, 2019) (unpublished).

### 23. **Subcontention 23 – Petitioner's Access to Discovery Material**

In nearly every Subcontention of ineffective assistance, Petitioner repeats the allegation that his trial counsel "prevented [Petitioner] for seen [sic] and have [sic] full access to Government's discovery." (2255 Pet. (Doc. 216) at 2-7, 9-10, 12-21, 28.) Petitioner elaborates on that allegation in Subcontention 23, in which he argues that, on September 11, 2013, Gates "brought [him] some discovery material," that Petitioner "expended about 7 hours going through the material" and "asked [] Gates what happened to the other part of the discovery," and that Gates responded that he had provided all of the discovery. (<u>Id.</u> at 23.) Petitioner maintains that he then told Gates that he "had not showed [Petitioner] pictures, videos, [] affidavits, search warrants[,] . . . [and an]

- 48 -

incident report, filed by Fairfax Police concerning with the pretextual stop[] executed by [D]etective[] Kroll and [D]etective Hook[e] on April [3,] 2012." (Id.) According to Petitioner, although Gates "said that he was going to come back with the rest of the discovery[,] . . . [he] did not came [sic] back to show [Petitioner] the rest of the discovery," (id.), but "told [Petitioner] that [Gates] did not have said affidavits and that it [sic] probably do not even exist," (id. at 3).

To the extent Petitioner faults his trial counsel for not providing Petitioner with physical copies of the Government's discovery material (beyond the material he apparently spent seven hours examining), that argument falls short for the simple reason that Petitioner possessed no constitutional right to physical copies of discovery. See Noble v. United States, Nos. 2:10-CR-51-JRG, 2:16-CV-38-JRG, 2018 WL 4441240, at *11 (E.D. Tenn. Sept. 17, 2018) (unpublished) (noting that "courts have found that, generally, the Constitution does not obligate an attorney to provide discovery materials to a criminally accused client"); see also Carillo v. United States, 995 F. Supp. 587, 591 (D.V.I. 1998) ("[T]here is no constitutional duty to share discovery documents with petitioner. Petitioner cites no case law for this proposition, and this court finds none."). Moreover, under the open file policy of the United States

- 49 -

Attorney for the Middle District of North Carolina, Petitioner did not have any right to obtain physical copies of the discovery, as explained by the court to Petitioner before trial:

> THE COURT: . . . [D]iscovery in this district is conducted pursuant to certain rules; and in order to obtain access for the discovery, unless things have changed, your attorney has to enter into an agreement with the Government. You all still require that written agreement?
>
> MR. POUSSON: We do, Your Honor.
>
> THE COURT: That limits dissemination of the materials?
>
> MR. POUSSON: Yes, Your Honor.
>
> THE COURT: In order to receive the discovery pursuant to the open file policy in the Middle District, your attorney has enters into an agreement with the United States, and there are certain conditions, and I can tell you -- I never practiced law under the written agreement. I practiced -- the rules were different at that time. But the United States has historically, and as I understand it to this day, still places limits on the copying and distribution of discovery materials that are provided. So the fact that Mr. Gates has not provided you with certain discovery materials is not a matter that troubles me at all. He has done, it sounds like, what he is supposed to do, which is to take those materials and then discuss those materials with you in preparation for this case.
>
> So you may agree with me; you may disagree with me. But a complaint that the attorney has not provided copies of the materials for an individual defendant to keep and maintain does not trouble me in terms of the issues in the case, and it certainly doesn't raise any suggestion in my mind -- even a suggestion in my mind of ineffective assistance of counsel.

- 50 -

(Trial Tr. vol. 1 (Doc. 167) at 8-10.)

Petitioner's complaint that trial counsel did not show him documents related to the Fairfax traffic stop and search fares no better. Given Petitioner's admission that Gates told him that he did not possess an affidavit supporting the search warrant and that such an affidavit probably did not exist, he cannot fault his attorney for failing to show him a document he did not have (and that likely did not exist at all). Furthermore, even assuming that Gates failed to show Petitioner documents related to that search, Petitioner still has not established how that failure prejudiced him. Petitioner's unsubstantiated hunch that those documents would reveal that the detectives had "fabricated probable cause," (2255 Pet. (Doc. 216) at 2), and "had been acting in [] bad faith (police corruption and that they do not have respect for the law)," (id. at 3), falls far short of demonstrating a "reasonable probability" that, but for trial counsel's withholding of the Fairfax search documents, the result of the proceeding would have been different. Strickland, 466 U.S. at 694; see also Nickerson, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported,

- 51 -

conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing.").

### 24. <u>Subcontention 24 – Bond Hearing</u>

In Petitioner's 24th Subcontention of ineffective assistance, he faults Gates for declining in open court on September 3, 2013 "to file a bond hearing for [Petitioner]" because the "trial date was not terribly far away, so that there might be reduce [sic] utility for a detention hearing at th[at] point." (2255 Pet. (Doc. 216) at 23.) According to Petitioner, Gates' "judgment was totally wrong because the trial had lasted about near to one year," and other co-defendants "got 'bond' [sic] out and they fought their cases from the out side [sic]." (<u>Id.</u>) Petitioner contends that "a good contested bond hearing, by a competent attorney would have entitle [sic] him to release and he would have[] had better options to fight back and actually prove his innocence and police corruption." (<u>Id.</u> at 24.)

As an initial matter, Petitioner's claim fails as conclusory, as he does not explain how his release would have led to a different outcome in his case. <u>See</u> <u>Nickerson</u>, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit.

- 52 -

Unsupported, conclusory allegations do not entitle a habeas

petitioner to an evidentiary hearing.").

Moreover, his claim is non-cognizable on Section 2255

review, as well-explained by another federal district court:

> Egwuekwe avers that counsel inappropriately withdrew
> the motion [for pre-trial release] over his objection
> and refused to refile.
>
> This claim falls outside the ambit of Section
> 2255. Facially, the issue of pretrial detention is not
> a means of attacking a federal prisoner's sentence.
> See 28 U.S.C. § 2255. Therefore, this portion of
> Egwuekwe's motion is not properly brought pursuant to
> Section 2255.

United States v. Egwuekwe, Criminal No. 1:14-CR-6, 2017 WL

5009100, at *9 (M.D. Pa. Nov. 2, 2017) (unpublished).

Furthermore, Petitioner has presented no evidence to support his

assertion of likely release, given his status as an alien

previously deported and that the United States District Court

for the Eastern District of Virginia (where Petitioner was

arrested) entered an Order of Detention Pending Trial on July 3,

2013, finding that Petitioner constituted a flight risk, and

that "no condition or combination of conditions [would]

reasonably assure [Petitioner]'s appearance." (Doc. 11-6.) See

Egwuekwe, No. 1:14-CR-6, 2017 WL 5009100, at *9 ("[Counsel]'s

decision to withdraw the motion [for pre-trial release] was

reasonable under the circumstances. . . . [Given that] Egwuekwe

- 53 -

was denied bail at his initial hearing because he was deemed a flight risk.").

### 25. Subcontention 25 – Attorney-Client Privileged Communications

Petitioner next argues that trial counsel "failed to protect [Petitioner]'s right to attorney's [sic]/client privileged communications," because Gates "had permitted the disclosure of to [sic] much attorney's [sic]/client privileged communications in open court, in the present [sic] of the public and the Assistant United States Attorney." (2255 Pet. (Doc. 216) at 24.) According to Petitioner, "Gates should have requested to the court to exclude every one [sic] from the courtroom except judicial officials, [Petitioner], and Gates . . . [and] subsequently this proceeding should have been sealed." (Id.)

This Subcontention fails for three reasons. First, Petitioner fails to identify any specific instances in which attorney-client privileged communications were improperly disclosed in open court and thus the claim fails as conclusory. See Nickerson, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing.").

Case 1:13-cr-00230-WO   Document 239   Filed 09/28/20   Page 54 of 75

Second, as the Fourth Circuit recognized in its opinion denying Petitioner's direct appeal:

> [N]either Carranza nor his attorney invoked the attorney-client privilege. In fact, during the first of the hearings into Carranza's motions, the district court informed Carranza that "if at any point we need to have - excuse the prosecutor, if there is anything confidential or privileged, just let me know, because I'm glad to do that if it needs to be done." Neither Carranza nor his attorney ever indicated that they wished to discuss matters outside the Government's presence.

Carranza, 645 F. App'x at 299–300 (emphasis added). The record demonstrates that, notwithstanding representation by counsel, Petitioner addressed the court on numerous occasions before his trial, during trial, and during sentencing and could have requested on any of those occasions that the court excuse the prosecutor and/or the public. Third, Petitioner has not shown how Gates' alleged disclosure of unidentified attorney-client privileged communications prejudiced his case in any way.

### 26. Subcontention 26 – Eighth Amendment Concerns

Via Subcontention 26, Petitioner challenges Gates' failure "to protect [Petitioner]'s constitutional rights" regarding a motion entitled "Eight [sic] Amendment Conditions Claim" which he filed on October 17, 2013, and which he alleges the court did not address. (2255 Pet. (Doc. 216) at 24-25.) Petitioner conclusorily contends that "the fact that [he] was injured

- 55 -

[during pre-trial confinement] and that he was not receiving the appropriate medical attention to his injures [sic] . . . could have been use [sic] as mitigating factor to get a lower sentence." (Id. at 25.) However, Gates could not have acted ineffectively for failing to "promote" Petitioner's motion challenging the conditions of his confinement because, as well-argued by the Government:

> Allegations related to the conditions of []
> [P]etitioner's confinement are not properly raised in
> a § 2255 motion. Instead, such allegations, if raised
> at all, should be addressed in a Bivens action filed
> in the jurisdiction where the petitioner is being
> held. A Bivens action is a judicially created damages
> remedy which is designed to vindicate violations of
> constitutional rights by federal actors. See, Bivens
> v. Six Unknown Federal Agents of Federal Bureau of
> Narcotics, 403 U.S. 388 (1971); See also, Carlson v.
> Green, 446 U.S. 14 (1980) (extending Bivens to Eighth
> Amendment claims).

(Doc. 221 at 17.)

## 27. Subcontention 27 – Jury Instructions and Indictments

In a rambling and somewhat incoherent fashion, Subcontention 27 faults Gates for failing to communicate with Petitioner to help him understand the case, object to multiplicitous charges, request a clarifying instruction to the jury on how to apply the evidence to each charge, address Petitioner's concerns of double jeopardy, file a motion for a bill of particulars because the Superseding Indictment failed to

- 56 -

establish that the conspiracy started back in 2010, address Petitioner's issues regarding selective and vindictive prosecution, and call Ortiz, Larios, and Rivera as witnesses on Petitioner's behalf. (See 2255 Pet. (Doc. 216) at 25-29.) As discussed in connection with Petitioner's Subcontention 18, sufficient evidence supports the Government's theory that the conspiracy began in 2010. Subcontention 27's remaining allegations fail as utterly conclusory. See Nickerson, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing.").

### 28. Subcontention 28 - Sentencing

Via Subcontention 28, Petitioner claims that his trial counsel provided ineffective assistance by discussing the Presentence Investigation Report ("PSR") with him one day before the initial sentencing hearing date. (2255 Pet. (Doc. 216) at 29, 31.) The transcript of that hearing confirms that trial counsel advised the court that he met with Petitioner the day before the hearing to discuss the PSR. (See Sentencing Hr'g Tr. (Doc. 154) at 3-4, 10.) However, Petitioner cannot show prejudice arising from that fact, because the court continued

- 57 -

the sentencing until July 23, 2014, to give Petitioner more time to review the PSR, (see id. at 16), and Petitioner concedes that Gates did go over the PSR with Petitioner an additional time between June 17, 2014, and July 23, 2014, (see Sentencing Hr'g Tr. (Doc. 174) at 3).

Petitioner additionally complains that Gates prevented Petitioner from being interviewed by the Probation Officer and therefore from presenting his objections to the PSR to the Officer. (See 2255 Pet. (Doc. 216) at 29.) In that regard, Petitioner "assert [sic] that he wanted to be interviewed by Probation [O]fficer, and discuss some evidences [sic] that he believe [sic] they were inaccurate . . . and reflected [sic] it on the [PSR]." (Id.) Petitioner contends that he wished to:

- show the Probation Officer an exhibit which reflected that Gates had failed to raise a collateral attack on the propriety of the underlying deportation in Petitioner's Re-Entry Case, (id.);

- have the Probation Officer call Gudiel and show him Government's Exhibit 145K, the photograph of the four-door Toyota Tacoma, (id.);

- ask the Probation Officer to review the inventory report from the Maryland traffic stop to verify that the shipping manifests were not listed thereon, (id. at 29-30);

- 58 -

- advise the Probation Officer of the existence of defense witnesses not called at trial, such as Rivera, Ortiz, Larios, and business owners at 924 Carter Avenue, (id. at 30); and

- have the Probation Officer consider that the Government did not produce any evidence that the conspiracy started in 2010 at 924 Carter Avenue, (id. at 30-31).

According to Petitioner, "such information would have probably stopped the sentencing and probably declared it mistrial or totally dismissal [sic] of [Petitioner]'s charges." (Id. at 29.)

As an initial matter, the PSR reflects that Petitioner refused to be interviewed by the Probation Officer, and not that Gates prevented the meeting himself. (See PSR (Doc. 126) ¶¶ 72, 116.) However, even assuming, arguendo, that Gates prevented Petitioner from meeting with the Probation Officer, Petitioner has not shown how that action resulted in prejudice. Petitioner's complaint that Gates prevented him from informing the Probation Officer about Gates' alleged failure to attack Petitioner's deportation in his Re-Entry Case fails as non-cognizable in this matter, which challenges only his convictions and sentences in the chop-shop case, No. 1:13CR230-1. Moreover,

- 59 -

as discussed above in connection with Subcontentions 2, 3, 4, 5, 9, 16, and 18, Petitioner's objections to the PSR lack merit, and thus Petitioner has not shown a reasonable probability that, but for Gates' alleged interference, Petitioner's objections would have resulted in a different outcome in his case.

In addition, Petitioner contests Gates' statement to the trial court at the initial sentencing hearing on June 17, 2014, that "he had reviewed the [PSR] and basically conducted a thorough in [sic] investigation factual and legal," because in paragraph 70 of the PSR, the "Probation Officer states that the Government did not provide on time the information concerning with the amount of victims and amount of loss, and as such Probation Officer was not able to verified [sic] said information." (2255 Pet. (Doc. 216) at 32 (referencing PSR (Doc. 126) ¶ 70; Sentencing Hr'g Tr. (Doc. 154) at 3-4).) In further support of that argument, Petitioner points out that the Government filed two Memoranda of Restitution on June 23, 2014, and July 29, 2014, which he contends corrected the restitution information in the PSR. (2255 Pet. (Doc. 216) at 32.)

Petitioner's argument glosses over the fact that the Government electronically filed a Memorandum on Restitution under seal on June 11, 2014, (Doc. 127), and the certificate of service reflects that the Special Assistant United States

- 60 -

Attorney would notify Gates of the filing, (see id. at 19).
Thus, Gates had access to information from the Government, in
addition to the PSR, on the number of victims and amount of loss
prior to the initial sentencing hearing on June 17, 2014.

Next, Petitioner faults Gates for failing to object in the
PSR to the four-level enhancement to Petitioner's base offense
level under U.S.S.G. § 2B1.1(b)(2)(B) based on the number of
victims (more than 50). (2255 Pet. (Doc. 216) at 32-33; see also
PSR (Doc. 126) ¶ 79.) According to Petitioner, the PSR provided
that "only 47 victims had been verified that there [sic]
vehicles had been stolen," and that 15 other potential victims
existed but had not been verified, (2255 Pet. (Doc. 216) at 32),
and the Government's Memorandum on Restitution filed on June 23,
2014, further altered the number of victims, (id. at 32-33).

Petitioner's argument fails, because filing such an
objection would have been futile. As well-explained by the
Government in its brief on direct appeal:

> The Mandatory Victims Restitution Act of 1996
> ("MVRA") governs restitution to victims of property
> offenses and certain other crimes, and sets forth the
> process to be followed in awarding restitution.
> 18 U.S.C. § 3663A. . . . A victim cannot be compelled
> to participate in the restitution process, and
> disputed losses that are not established by a
> preponderance of the evidence within ninety days after
> the defendant's sentencing are often waived. See, 18
> U.S.C. § 3664.

As a practical matter, if a victim fails to cooperate or chooses not to seek restitution, the restitution order will likely exclude that victim and victim's loss from the total number of victims and the total amount of restitution due. However, exclusion of that victim from the restitution order certainly does not mean that the victim and the loss were improperly included for purposes of assessing the defendant's relevant conduct.

Another practical consideration in this case is the length of time covered by the relevant conduct. Many of the victim[s'] cars were stolen months or even years before the case came to trial. During the intervening time, most individual owners had been compensated by their insurance companies for the loss, making restitution payable to a smaller number of insurance companies who absorbed the financial loss of a larger number of victims.

As a legal matter, calculating a sentence under the United States Sentencing Guidelines is different from calculating an award of restitution. Under the guidelines, enhancements are determined by the defendant's relevant conduct, which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and in the case of a jointly undertaken criminal activity, "all reasonably foreseeable acts and omissions of others in the furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1) (2014). This relevant conduct may be broader than conduct making up the offense of conviction and, similarly, may involve victims and losses not reflected in a restitution order.

Brief of Appellee (Doc. 95) at 39-41, United States v. Carranza, No. 14-4631 (4th Cir. Jan. 6, 2016).

- 62 -

The Fourth Circuit agreed and denied Petitioner's claim
that the trial court erred by assessing the four-level
enhancement under U.S.S.G. § 2B1.1(b)(2)(B):

> Although the Government's memorandum with respect to
> restitution identified only 24 victims, we have
> previously explained in a related context that "losses
> relevant to finding the appropriate offense level and
> therefore the proper sentence of imprisonment is . . .
> not the same question as the amount of losses properly
> covered by an order of restitution." United States v.
> Newsome, 322 F.3d 328, 338 (4th Cir. 2003). And a
> review of Carranza's PSR and the Government's
> restitution memorandum indicate that 24 different
> insurance companies and at least 47 individuals were
> victimized by his offenses. As a result, we see no
> error in the district court's application of
> § 2B1.1(b)(2)(B).

Carranza, 645 F. App'x at 300.

Petitioner also faults Gates for "fail[ing] to object [to]
the fact that [Petitioner] was [sic] been subject [sic]
accountable for the full amount of loss of the overall
conspiracy" even though "the Government had fell [sic] short to
established [sic] that [Petitioner] was the leader" of the
conspiracy. (2255 Pet. (Doc. 216) at 33.) The court noted at
sentencing that "the chop shop operation . . . was a long-term,
sophisticated car theft chop shop operation in which Mr.
Carranza, as is properly reflected in the guideline calculation,
was certainly a leader of this activity both in terms of
stealing the cars as well as delivery of the vehicles to various

- 63 -

ports for export, resale, and various other matters, and,
therefore, a substantial sentence is required looking at that
factor." (Sentencing Hr'g Tr. (Doc. 174) at 12-13.) "If the
court finds that more than 1 defendant has contributed to the
loss of a victim, <u>the court may make each defendant liable for
payment of the full amount of restitution</u> or may apportion
liability among the defendants to reflect the level of
contribution to the victim's loss and economic circumstances of
each defendant." 18 U.S.C. § 3664(h) (emphasis added). Here, the
court ordered that the total restitution amount be "imposed
joint and severally" among Petitioner, Ortiz, Turner, and
Wilkerson. (Doc. 143 at 7.) Petitioner has simply not shown any
impropriety in the court's decision-making with regard to joint
and several liability, and accordingly, Gates did not act
ineffectively by failing to object. See <u>Oken</u>, 220 F.3d at 269
("[C]ounsel [is not constitutionally ineffective in failing to
[take action if] . . . it would have been futile for counsel to
have done so . . . .").

     Petitioner further alleges that "Gates failed to aid
[Petitioner] with his concerns about the disproportionate
sentence in comparison with his co-conspirator especially with
his co-conspirator [] Othman." (2255 Pet. (Doc. 216) at 33.)
According to Petitioner, his "sentence is about five times

longer that [sic] the one imposed to co-conspirator Othman,"
(id.), which demonstrates that the court failed to take into
consideration "the need to avoid unwarranted sentence
disparities among defendants with similar records who were found
guilty of similar conduct" under 18 U.S.C. § 3553(a)(6) and 28
U.S.C. §§ 991(b)(1)(B) and 994(f). (Id. at 33-34.)

Petitioner's argument falls short, because any objection by
Gates on this ground would have been futile. Petitioner raised
this issue at the sentencing hearing, (see Sentencing Hr'g Tr.
(Doc. 174) at 9-10), and the court rejected it as follows:

> Mr. Carranza makes an argument of the need to avoid
> unwarranted sentence disparities among
> defendants with similar records who have been found
> guilty of similar conduct, and he points to Mr. Othman
> in this case as a circumstance in which Mr. Othman
> received a substantially lesser sentence than
> Mr. Carranza will receive in this case.
>
> First of all, with respect to the need to avoid
> unwarranted sentence disparities, that is generally
> not a case-specific -- it can be -- but generally not
> a case-specific type of disparity to be avoided as
> circumstances between individuals, even in the same
> case, can vary significantly, but it is intended to be
> also served an avoidance of national disparities in
> sentencing, and Mr. Carranza does not point to
> anything that would suggest the sentence imposed in
> this case somehow leads to unwarranted sentencing
> disparities between similarly situated defendants with
> respect to that type of analysis.
>
> But even with respect to individual disparities,
> the Othman disparity is one that has been addressed
> both in the [PSR] as well as various other
> sentencings, and it is clear to this [c]ourt that

- 65 -

>      Mr. Carranza's circumstances are entirely different
>      from Mr. Othman such that that comparison -- even if
>      their respective roles in the offense were similar
>      enough to make them similarly situated defendants in
>      light of the nature and circumstances of the offense,
>      the circumstances of both their post offense conduct,
>      their actions within this particular prosecution, as
>      well as Mr. Othman's -- well, I'll just say their
>      actions within this prosecution in addition to
>      Mr. Othman's cooperation, it appears to this [c]ourt
>      that there simply is no similarity between
>      Mr. Carranza and Mr. Othman from a legal standpoint
>      that would require this [c]ourt to somehow perhaps
>      reduce Mr. Carranza's guideline calculation and
>      resulting sentence to account for an unwarranted
>      disparity between these two individuals, and,
>      therefore, the [c]ourt does not find Mr. Carranza's
>      argument with respect to unwarranted sentencing
>      disparities persuasive.

(Id. at 14-16.) Petitioner does not present any facts or

arguments to overcome the court's reasoning on this point. See

Wilson v. United States, Nos. 1:12CR187-1, 1:13CV783, 2015 WL

1458062, at *4 (M.D.N.C. Mar. 30, 2015) (unpublished) (rejecting

argument that court did not comply with the mandate of Section

3553(a)(6) to "consider the need to avoid unwarranted sentence

disparities among defendants with similar records who have been

found guilty of similar conduct" because the petitioner "ma[de]

no effort to" supply supporting facts).

        Petitioner also claims that Gates provided ineffective

assistance by failing to object to sentencing manipulation

because the Government opted not to file a motion for downward

departure based on Othman's substantial assistance under 18

- 66 -

U.S.C. § 3553(e) and U.S.S.G. § 5K1.1, but instead chose not to submit restitution and victim information for inclusion in Othman's PSR. (See 2255 Pet. (Doc. 216) at 33-36.) That argument fails, because Petitioner has provided no facts to support his bald assertion of sentencing manipulation by the Government. See Nickerson, 971 F.2d at 1136 ("In order to obtain an evidentiary hearing on an ineffective assistance claim . . . , a habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to an evidentiary hearing."). Moreover, unless tied to a sentencing disparity argument (which, as outlined above, would have failed), Gates lacked any basis to object to the particulars of Othman's sentence at Petitioner's sentencing.

### 29. Subcontention 29 – Four-Level Enhancement under U.S.S.G. § 2B1.1(b)(2)(B)

In his final Subcontention of ineffective assistance, Petitioner faults his trial counsel for failing to object to the four-level enhancement to Petitioner's base offense level under U.S.S.G. § 2B1.1(b)(2)(B) in the PSR. (2255 Pet. (Doc. 216) at 37.) That allegation fails for the reasons set out in the discussion of Subcontention 28.

- 67 -

**B. Ground Two – Trial Court Bias/Abuse of Discretion**

In Ground Two, Petitioner alleges that the trial court was "biased" and "abuse[d its] discretion," (2255 Pet. (Doc. 216) at 42 (bold font and capitalization omitted)), in the following eight ways: (1) denial of Petitioner's motion to substitute counsel on September 3, 2013, (see id. at 42-46); (2) failure to rule on Petitioner's Eighth Amendment Conditions Claim motions filed on October 17 and 29, 2013, (see id. at 46-47); (3) denial of Petitioner's December 19, 2013 oral motion to dismiss for ineffective assistance of counsel in the Re-Entry Case, (see id. at 47-51; 2255 Pet. Attach. (Doc. 216-1) at 1); (4) failure to remove Gates as counsel in response to Petitioner's January 7, 2014 letter to the court, (see 2255 Pet. Attach. (Doc. 216-1) at 1-2); (5) denial of Petitioner's motion to dismiss for ineffective assistance of counsel on February 24, 2014, (see id. at 2-4); (6) denial of Petitioner's motion to dismiss the charges on March 4, 2014, (see id. at 4-8); (7) failure to remove Gates as counsel on June 17, 2014, (see id. at 8-10); and (8) failure to remove Gates as counsel at sentencing on July 23, 2014, sentencing Petitioner based on incorrect information in the PSR as to the number of victims, allowing Cannady's testimony, failing to enforce the sequestration of witnesses,

and failing to address that the jury's verdict was based on "guess work," (see id. at 10-15).

Petitioner raised the substance of all of those Subcontentions on direct appeal with the exception of the claims about Cannady's testimony, sequestration, and jury "guess work." See Carranza, 645 F. App'x at 297-301; see also id., Brief of Appellant (Doc. 81) at 17-55, United States v. Carranza, No. 14-4631 (4th Cir. Oct. 21, 2015). He cannot re-litigate those matters via his Section 2255 Motion. See United States v. Linder, 552 F.3d 391, 396 (4th Cir. 2009) ("Linder may not circumvent a proper ruling on his . . . challenge on direct appeal by re-raising the same challenge in a § 2255 motion."); United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993) (holding that law of the case doctrine "forecloses relitigation of issues expressly or impliedly decided by the appellate court"); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam) (explaining that a criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]").

Petitioner's remaining allegations fall far short of showing trial court "bias" or "abuse of discretion." As discussed in the context of Petitioner's Subcontention 12 of ineffective assistance, Petitioner's allegation that the jury

was not properly apprised of Cannady's plea and immunity agreements lacks merit. Petitioner's claim that the trial court failed to enforce the sequestration of witnesses during the trial fails, because Petitioner has not pointed to a motion from either the Government or Petitioner to sequester witnesses. Lastly, Petitioner's allegation that the jury's verdict was based on "guess work" fails as wholly conclusory. See Dyess, 730 F.3d at 362 ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.").

### C. **Ground Three – Malicious and Vindictive Prosecution**

In his third ground for relief, Petitioner asserts that he was subjected to "malicious and vindictive prosecution," (2255 Pet. Attach. (Doc. 216-1) at 15-19 (bold font and capitalization omitted)), in that the prosecution (1) manipulated the grand jury, (see id. at 15); (2) relied on inadmissible evidence obtained during the April 2, 2013 Fairfax traffic stop to indict and convict Petitioner, (see id.); (3) concealed Detective Hooke's evidence of "tampering" and "planting" during the September 24, 2012 Maryland traffic stop, (id. at 15-16); (4) concealed that the Toyota Tacoma in Count Seven of the October 29, 2013 Superseding Indictment was not stolen, (see id. at 16-17); (5) allowed Detective Kroll to testify that the

vehicle involved in the April 3, 2012 Fairfax traffic stop was stolen, (see id. at 17); (6) relied on evidence from the illegal search by Officer Lynde on September 25, 2012, (see id.); (7) broke the sequestration rule, relied on inadmissible testimony from co-defendants as well as threatened them with federal charges and long sentences, and tricked Cannady into believing he had plea and immunity agreements, (see id.); (8) indicted Petitioner on multiplicitous charges, (see id. at 18); (9) allowed officers from Maryland, Virginia, and Durham to testify falsely and upon inadmissible evidence, (see id.);[5] (10) failed to prove that the conspiracy started in 2010 at 924 Carter Avenue, (see id.); and (11) manipulated sentencing proceedings (see id. at 18-19).

Petitioner's claims of malicious and vindictive prosecution are barred because Petitioner did not raise those claims on direct appeal. See United States v. Frady, 456 U.S. 152, 167-68 (1982). A post-conviction motion is not a direct appeal, and "[f]or this reason, [the Supreme Court has] long and consistently affirmed that a collateral challenge may not do service for an appeal." Id. at 165; see also United States v.

---

[5] Petitioner included two Subcontentions listed as "Eighth." (2255 Pet. Attach. (Doc. 216-1) at 18.)

Pettiford, 612 F.3d 270, 279 n.7 (4th Cir. 2010). Thus, a claim raised for the first time in a § 2255 motion generally is not reviewable unless a defendant demonstrates "both (1) 'cause' excusing his [] procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." Id. at 168.[6] Petitioner has not provided any cause excusing the procedural default, nor has he established actual prejudice. Therefore, Petitioner is precluded from bringing his allegations of malicious and vindictive prosecution as new claims on collateral review.

**D.**   **Ground Four – Ineffective Assistance of Appellate Counsel**

Claims of ineffective assistance of counsel on appeal are also judged using the Strickland test. See Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008). Appellate counsel need not raise on appeal every non-frivolous issue requested by a

---

[6] A petitioner may also overcome procedural default by demonstrating that a court's failure to consider the claim will result in a fundamental miscarriage of justice. See Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)). This exception applies only to cases involving extraordinary instances "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392-94 (2004) (citing Murray v. Carrier, 477 U.S. 478, 494-96 (1986)). Petitioner has not meaningfully alleged actual innocence and the application of this exception is not apparent from the face of Petitioner's pleadings or the record.

- 72 -

defendant. Jones v. Barnes, 463 U.S. 745, 752–53 (1983); see also Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989). Ineffective assistance of appellate counsel can be shown by demonstrating that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Bell v. Jarvis, 236 F.3d 149, 180 (4th Cir. 2000) (citation omitted).

Via Ground Four, Petitioner faults his appellate counsel for raising claims of ineffective assistance of trial counsel, trial court bias and abuse of discretion, and malicious and vindictive prosecution on direct appeal rather than in a Section 2255 motion. (See 2255 Pet. Attach. (Doc. 216-1) at 19.)[7] Petitioner's argument glosses over the fact that Brewer was appointed to represent Petitioner in his direct appeal only. See Order (Doc. 12) at 1-2, United States v. Carranza, No. 14-4631 (4th Cir. Aug. 21, 2014). Moreover, Petitioner had no constitutional right to counsel for his Section 2255 Motion. See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."). Accordingly, Brewer

---

[7] As noted above in the discussion of Ground Three, Petitioner's appellate counsel did not raise any claims of malicious and vindictive prosecution on appeal.

- 73 -

could not have acted ineffectively for failing to raise those claims in a Section 2255 Motion.

Furthermore, Petitioner cannot show that Brewer's inclusion of the ineffective assistance claims on direct appeal prejudiced Petitioner in any way. The Fourth Circuit did not consider Petitioner's ineffective assistance claims on the merits because "ineffective assistance d[id] not conclusively appear on the record [and] . . . Carranza's claims should be raised, if at all, in a [Section] 2255 [] motion," Carranza, 645 F. App'x at 301. Lastly, to the extent appellate counsel did raise claims involving trial court error, far from showing ineffective assistance, appellate counsel must raise such arguments on direct appeal to avoid procedural default. See Frady, 456 U.S. at 167-68.

E.    **Ground Five – Due Process**

Ground Five contends that "the practice of deprive [sic] a defendant of physical possession of government's discovery as unconstitutional," (2255 Pet. Attach. (Doc. 216-1) at 20), and "do not comply with confrontation clause and due process of law.," (id. at 21 (bold font omitted)). This contention fails for the reasons discussed in the context of Subcontention 23 of Ground One.

IV.  **CONCLUSION**

Petitioner presents no basis upon which to find he is entitled to relief, as the files and records of the case conclusively show that Petitioner is not entitled to relief. Even assuming some error on the part of counsel, which does not appear from this record, Petitioner has not shown any reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

**IT IS HEREBY ORDERED** that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence, (Doc. 216), is **DENIED** and that this action is **DISMISSED WITH PREJUDICE.**

A judgment dismissing this action will be entered contemporaneously with the Memorandum Opinion and Order. Finding no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction, nor a debatable procedural ruling, a certificate of appealability is not issued.

This the 28th day of September, 2020.

_____
United States District Judge

- 75 -